Filed 6/24/16  P. v. Park CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B260433 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA075285) |
| v. | |
| HAROLD YONG PARK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark E. Windham, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Garett A. Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Harold Yong Park (defendant) appeals from his murder, robbery and burglary convictions. He contends that the trial court erred by denying his motion to suppress his confession and by excluding evidence of third-party culpability. Defendant also seeks review of the court's determination that there were no discoverable documents relating to defendant's *Pitchess* motion.[1] We find no merit to defendant's contentions and no abuse of discretion in the trial court's *Pitchess* review. We thus affirm the judgment.

## BACKGROUND

Defendant was charged with three counts of murder (counts 1 through 3), in violation of section 187, subdivision (a), three counts of first degree robbery (counts 4 through 6), in violation of section 211, one count of first degree burglary (count 7), in violation of section 459, and one count of selling, offering to sell, or transportation of marijuana (count 8), in violation of Health and Safety Code section 11360, subdivision (a). As to counts 1, 2, and 3, the special circumstances that defendant committed the murders while engaged in the crimes of robbery and burglary, within the meaning of section 190.2, subdivision (a)(17) were also alleged. As to counts 1 through 7, it was alleged that defendant personally and intentionally discharged a firearm, causing great bodily injury and death, within the meaning of section 12022.53, subdivision (d).

In exchange for waiving a jury trial, the prosecution agreed not to seek the death penalty, and defendant was tried by the court. Defendant was found guilty of all counts as charged and the special allegations were found to be true. On November 20, 2014, the court sentenced defendant to three consecutive life terms in prison without the possibility of parole (counts 1, 2, and 3) plus three consecutive firearm enhancements of 25 years to life. The court imposed a consecutive four-year term as to count 8, and stayed the sentences in counts 4, 5, 6, and 7, pursuant to section 654. Mandatory fines and fees

---

[1]    See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.5 and 832.7; Evidence Code sections 1043 through 1045. All further statutory references are to the Penal Code, unless otherwise indicated.

were imposed as well as victim restitution. Credit for 1,543 actual days of presentence custody was also granted.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

*The shootings*

Eric Huber (Huber) testified that on August 26, 2010, he lived in a second floor apartment on Kings Road in West Hollywood. As he arrived home at about 8:30 p.m., he saw two men outside the secure front door of the apartment building. He described one as Arabic or Hispanic, taller than the other, over 200 pounds, and bald. The other was smaller, white, and bearded. One of them was on his phone and they appeared to be waiting for someone. Huber had entered the building and was in the elevator when the two men he had seen at the front door also entered the elevator with a third man not previously seen. Huber described the third man as Asian, smaller than both the other men, wearing a black baseball cap, black shirt, black backpack, and clear prescription glasses. The first two men conversed lightheartedly, while the Asian man looked uncomfortable. The three men got off the elevator with Huber, but Huber did not see where they went. About 10 minutes after he entered his apartment, Huber heard five bangs, three in rapid succession, then two more, coming from the direction in which the men had gone. When Huber looked out and saw nothing in the courtyard, he dismissed the noise as firecrackers and left for the gym.

The manager of the apartment building testified to having received a call from one of the tenants who reported hearing gunshots in the apartment next door, where an older couple named Moussazadeh lived, sometimes with their son. When he arrived to check the apartment, he found the door slightly ajar, and yelled, "Anybody there?" When no one answered, he looked into the hallway, where he saw blood and two men lying on the floor. The manager backed out and called 911.

*The investigation*

Los Angeles County Deputy Sheriff Jaime Magana arrived at the apartment building approximately 8:45 p.m. with his partner and three other deputies. He entered

the apartment, where he saw three men with gunshot wounds to the head and profuse bleeding. Deputy Magana smelled a distinct odor of fresh marijuana inside the apartment. He also observed bullet casings for nine-millimeter luger rounds.

The investigating officer, Sheriff Sergeant William Marsh, narrated a 10-minute video-recorded preliminary walk-through of the apartment as he examined the scene. Sergeant Marsh testified that as he approached the front door he smelled the odor of fresh, not burnt, marijuana. Once inside he detected a marijuana odor coming from bins, which were empty except for what appeared to be marijuana debris. He saw drawers ajar, as though the location had been ransacked, and found six nine-millimeter bullet casings and four expended bullets. Two other bullets were later recovered from two of the victims. The body found lying in the hall was identified as victim Pirooz Moussazadeh. Another victim, who was found near the sofa, was identified as Shahriar Moussazadeh, brother of Pirooz.[2] The third victim was Bernard Khalili (Khalili), whose body was found near the bins smelling of marijuana.

The stipulated testimony of the medical examiners was that Dr. Pachael, Dr. Selser, and Dr. Gutstadt, conducted the autopsies and determined that each man died of a gunshot wound to the head. Dr. Pachael recovered a projectile from the right side of Shahriar's brain and determined that he had also sustained a perforating gunshot graze wound to the right thumb consistent with a defensive wound. Dr. Gutsadt recovered a projectile during the autopsy of Khalili, and determined it had been fired at close range, from right to left and back.

The parties also stipulated that firearms expert and criminalist, April Wong, collected from the apartment the six expended nine-millimeter luger caliber cartridge casings and four fired medium caliber bullets, compared them with the bullet recovered from Khalili and the bullet fragments recovered from Shahriar, and determined that all were fired from the same firearm.

---

[2]  To avoid confusion, we henceforth refer to the Moussazadeh brothers as Pirooz and Shahriar.

Sam Sazegar testified that his first cousin Pirooz and his friend Khalili sold marijuana grown at a house in the Valley. They had many marijuana plants growing, and Pirooz and Khalili would go there to pick leaves. About one week before their murders, after Pirooz and Khalili urgently asked him to help pick leaves because a big deal was pending, Sazegar spent two days picking leaves and putting them in large plastic bags.

Sergeant Marsh found Pirooz's cell phone in the apartment. Phone records revealed many calls to or from a number beginning in 842, which the parties stipulated to belong to defendant's cell phone (842 number).[3] The calls increased in frequency just prior to the murders. A search of defendant's cell phone records for the same period of time revealed a number for James Kim (Kim) and a number for Alla Cernov (Cernov), the coowner of a collective marijuana dispensary in Hollywood.

Sergeant Marsh found text messages on Pirooz's phone with defendant's 842 number. One text sent from defendant's phone read: "Wassup P. Its H. Been a minute. Met you at Allahs. Got anything bomb on deck. Needed to pick up minimum 2." Sergeant Marsh explained that Allah was a misspelling of Cernov's name, and that the text was meant to request any nice product in a minimum of two pounds. Two days before the murders, at 11:50 p.m., a text from the 842 number to Pirooz expressed an apology for missing their meeting and the hope that they could meet the next day. After Pirooz replied a minute later that he had two (pounds) left, defendant replied that he was trying for three to five pounds of the "32 stuff." Pirooz texted back that he would have Bubba Kush on Thursday. On the day of the murders, defendant texted to Pirooz that he liked both samples, wanted to work something out, and wrote: "35 for the bubs, 25 for the BC's?" A later text from defendant asked for four pounds, and then there was a series of back-and-forth texts to set up the meeting and estimating defendant's arrival time as he drove through the heavy traffic. Finally, at about 8:49 p.m., defendant texted: "I'm here P."

---

[3]     The parties also stipulated that defendant had his cell phone with him at the time of the murders.

When Sergeant Marsh spoke to Debora Ahoubim (Ahoubim), an acquaintance of Khalili, she told him that Khalili and Andrew Kramer, the owner of the grow house, grew marijuana there, and that their drug transactions were in the $20,000 range. On the night of the murders Khalili sent her the following text at about 8:34 p.m.: "Daddy is making $$$."

The parties stipulated to the admission of Kim's preliminary hearing testimony. Kim testified that he and defendant were friends, that Kim was defendant's *hyung*, literally older brother, but according to Korean custom, an older friend. Defendant had been staying with Kim and Kim's girlfriend for about two weeks before August 26, 2010, because of defendant's stressed financial situation. Defendant's former business partner, "Viet," had cheated defendant, found a new partner, and "threw him away." Sergeant Marsh and Detective Christopher Bergner (Bergner), went to Kim's home a few days after the murders, and Kim provided them with both his phone number and the 842 number. Kim denied that he knew anyone named Peter Kim.

During the late afternoon of Thursday, August 26, 2010, Kim noticed that his BMW was missing, but the defendant's Chevy Tahoe was there, so he called defendant. Defendant said he was getting the tire pressure fixed on the BMW and he would return it before Kim had to leave. When defendant did not return, Kim went to his regular poker game that night in the Tahoe. When defendant called during the game at about 9:00 p.m., Kim told him to bring the BMW to the address of the poker game. Defendant apologized, said he had "fucked up," and Kim replied, "I don't want to hear it. I don't want to know." Defendant arrived between 11:00 p.m. and 12:00 a.m. with his friend Vanessa Lozano (Lozano) and asked for money, which Kim gave to him.

Kim told the detectives that when defendant said he had "fucked up," Kim thought that he was apologizing for not returning the car. However, when Kim met with the detectives again a few days later, he admitted that he had not wanted to incriminate defendant, because he was his little brother. Kim showed the detectives to defendant's room and explained that when he saw that the photograph of defendant's mother was gone, he knew that defendant was not returning.

6

*Defendant's arrest*

On August 30, 2010, Deputy Sheriff Shawn Cliver found defendant's black Chevy Tahoe parked at a motel in Palos Verdes. After the Tahoe came out of the motel parking lot, it was stopped, and defendant and Lozano were detained. After placing defendant and Lozano in separate patrol cars, Deputy Cliver approached the Tahoe, smelled marijuana, looked inside, and saw duffle bags, luggage, purses, a blue suitcase with a large amount of marijuana in it, and a paper bag. After the Tahoe was towed to the Sheriff's station, he examined the marijuana, which was green and smelled fresh.

Sergeant John Hanson testified that he obtained a warrant, participated in the search of the car, and recovered a blue suitcase with two large bags of marijuana inside. He also found a black baseball cap, a black T-shirt, a pair of wire-rimmed glasses, a large amount of men's clothing, several cell phones, suitcases, backpacks, and bags. Defendant's birth certificate and passport photos were found in one of the suitcases. Based on the amount, packaging, and condition of the marijuana, it was Sergeant Hanson's opinion that the marijuana was possessed for the purpose of transportation or sales. He explained that if the marijuana was divided into smaller parcels, the street value would be $40,000 to $50,000, and the wholesale value would be about $20,000, depending on the type of marijuana. The wholesale value of medical grade marijuana such as Bubba Kush, which was grown in a controlled environment, would be about $30,000 for all three parcels. If broken into smaller quantities, the street value would be about $60,000 to $70,000. Medical marijuana grown in a grow house was commonly sold to dispensaries, but could be sold on the street.

*Defendant's confession*

Defendant was interviewed on the day he was arrested by Detectives Bergner and Marsh. Initially, they conversed about defendant's recent living arrangements, acquaintances, and his work procuring marijuana for dispensaries. Defendant admitted that the 842 number was one of his cell phone numbers, and explained that just the other day he had thrown away that cell phone because it had run out of prepaid minutes. Defendant added that he threw it away because he "just got freaked out . . . because of all

7

that crazy stuff going on . . . this past weekend . . . in Hollywood," and that he knew one of the three men, whom he called "P," as one of his vendors.

Defendant said he had picked up product from P three times in the previous week, and was supposed to meet him to pick up product (Bubba Kush) the night he died. Defendant waited for P outside the Hollywood apartment as usual, but badly needed to use a restroom, so he left to find one. When he returned 10 or 15 minutes later, he saw police cars outside the building, and "all this craziness." Detective Marsh stopped the interview at this point to go through *Miranda* advisements, and he questioned defendant as to whether he understood each of his rights. Defendant repeated them, stated that he understood them, and agreed to speak to the detectives, adding, "I'll just share with you whatever I -- I know, sir."

After a conversation about defendant's parents, his military service, and his friendship with Kim, Detective Marsh said, "No more lying, please." Defendant again told the detectives about waiting outside, texting P, leaving to find a restroom, and then leaving again upon finding a commotion at the apartment building. The detectives then told defendant that Kim had told them that he would not dishonor or disrespect himself by lying, and had told them about defendant's admission to Kim that he had "fucked up." Defendant asked whether he could start over, and then told the detectives that P did come outside, that defendant told him he needed to "take a leak," so they went into the building, rode the elevator with another man, and went into the apartment. Defendant claimed that once inside, a third man, who was sitting on the couch, pulled a firearm from under the couch, and said, "There's no weed. But you're not going to leave here." Defendant told him to calm down and sat on the couch next to the man with the gun. Defendant told the detectives that he had $30,000 in cash on his person to pay for 10 pounds of marijuana, but there was no marijuana in the apartment, and the men told him that he was not leaving with any product or his cash. Defendant claimed that he turned, lunged at the armed man, grabbed the firearm, and "just went off on -- on all three of them." He then "freaked out" and "ran out the door. Afterward, defendant disassembled

8

the nine-millimeter semiautomatic handgun, and disposed of the parts along the Pacific Coast Highway.

After going over the details once again, defendant changed his story. He claimed that P locked the door as soon as they entered the apartment, and that when he looked at the man on the couch, he saw the gun under his lap. The only marijuana in the apartment was in one large garbage bag under the kitchen table, and it was not the agreed upon Bubba Kush. Defendant grabbed the bag, transferred the marijuana to a paper bag and then ran out. Later, defendant threw away the black hat and black backpack. When asked about the $30,000, defendant told the detectives that there had been only $15,000 in the backpack. When asked about the whereabouts of the $15,000, defendant said he had only about $2,000 with him. The detectives then showed defendant the video of the scene, which depicted the plastic bins containing marijuana debris. Defendant denied that he had seen them. After the detectives went over defendant's details once again, defendant told them he had intended only to buy two pounds, or three to five pounds of a different variety of marijuana, and that he intended to offer the $2,000, with a promise to pay the rest within 48 hours.

After additional questioning by the detectives, defendant finally admitted that he brought the nine-millimeter handgun with him into the apartment. When he tried to negotiate with his $2,000, they laughed at him, and one of them smirked at him, which made him feel belittled and angry. He admitted that he shot each of the men in the head and then took the bag of marijuana.

**Defendant's testimony**

Defendant testified that he was 35 years old, grew up in Southern California, and after working at a friend's medical marijuana dispensary, he became a marijuana broker, first as an assistant manager for a dispensary, and later as an independent broker, beginning in early 2010. Defendant first met Pirooz at a dispensary that defendant managed, and then did business with him when defendant was working for himself. They had conducted about five transactions prior to August 26, 2010, each of which averaged a pound to a pound and a half of marijuana for $3,000 to $3,600 per pound.

9

For the August 26 transaction, Pirooz initially agreed to provide defendant with a price break, and defendant agreed to buy eight pounds: half Bubba Kush, a very high-grade strain, for which defendant would pay $3,500 per pound; and the other half, BC, a mid-grade strain, for which defendant would pay $2,500 per pound. As defendant had only half the necessary money, he intended to ask to pay half the agreed amount, and take the balance on consignment for 24 hours. When defendant went to Pirooz's apartment, he had about $15,000, which was not enough for the purchase. He drove there in Kim's BMW, with Kim's permission. When defendant arrived just after 8:00 p.m., Pirooz came out and told him to come inside, although prior transactions had been conducted in either defendant's or Pirooz's cars. A man wearing glasses was waiting in front of the building, and they took the elevator together. Defendant was dressed in a black golfer's cap, a gray long-sleeve flannel shirt, beige cargo shorts and flip flops, and he was not carrying a firearm.

When they entered the apartment, a third man was sitting on the couch, watching television. Defendant stood in the hallway with his back to the front entrance. Pirooz was standing in front of defendant, slightly to his right toward the kitchen, and Khalili was standing near the dining table. Defendant took the cash from his backpack and Pirooz instructed him to give it to the man in glasses, who then counted the money and said it was not the full amount. Defendant explained his proposal to Pirooz, who was not pleased, but did not make a fuss. At that moment, defendant heard a click, looked behind him, and saw a man wearing a black cap, black top, and black pants. Defendant did not see a firearm in the man's hands, but saw that his arm was raised. Without seeing the man's face, defendant fled the apartment down the fire escape and went straight to the car, hearing gunshots as he ran. He did not call the police.

Defendant drove to Melrose Avenue and called Kim. He then drove to La Habra, where Lozano lived. Defendant used a pay phone to call Lozano because he was concerned for her safety and did not want the call traced to her. Defendant claimed he disposed of his cell phone the following day because he did not want to have memories of the incident. Defendant arrived at Lozano's home just before 10:00 p.m., and then drove

back to Los Angeles to exchange the BMW for his Tahoe. When he tried to speak to Kim, Kim said he did not want to know or hear about anything that had occurred. Defendant asked Kim for money which Kim gave him. Defendant denied he transferred anything from the BMW to the Tahoe before driving it back to Lozano's home, where they spent the night.

The next morning while Lozano was still asleep, defendant went to Best Buy to purchase a cheap prepaid cell phone, and then, on Kim's advice, he obtained a copy of his birth certificate and photographs, so he could get a United States passport if necessary. Defendant thought he might have to leave the country to avoid becoming a murder suspect or otherwise involved in the case. He retrieved his personal property from Kim's house, then went to Kim's workplace for more cash from Kim, and then returned to Lozano's home. That night and the next were spent at a Palos Verdes hotel.

When defendant was pulled over by the deputy, he had all his clothing and some marijuana in the Tahoe, but claimed that he had obtained the marijuana prior to the August 26 incident. When he was pulled over, he had a "slight" idea why he was stopped. He was taken to the Lomita Station, where he was booked by a female jailer. He then met with Detective Song. They smoked cigarettes and Detective Song made it known he had a very long and close relationship with Kim. Defendant felt at ease, as though someone was on his side. At the end of the conversation with Detective Song, defendant requested a lawyer, but Detective Song told him he would not need one. Defendant was taken back to a cell, and when Detectives Bergner and Marsh took him to the interview room, he still felt at ease, except that he worried about Lozano when he saw a photograph of her on the table in the interview room. Initially, as the detectives engaged him in general conversation about himself and his involvement in the medical marijuana trade, defendant remained at ease. Eventually the discussion turned to the incident in Hollywood, and defendant gave his account. Defendant admitted that he gave the detectives at least four different versions during the recorded interview. However, he explained that the detectives said numerous times that he was not telling the truth, and each time they did, defendant's reaction was to alter his answers with fictional

11

information. First he told them about arriving, seeing police tape, and leaving, and then about the struggle with the firearm produced by the man on the couch. When the detectives did not believe it, he told them he had gone to the apartment with the firearm. Defendant then told them that he had committed the murders, that he freaked out and shot the men.

Defendant claimed that he changed his story in an attempt to satisfy the detectives, which he thought would end the interview so he could leave, because Detective Song had told him that he should just answer the questions of the detectives, and the sooner they were satisfied with his answers, the sooner that the interview would be over and he and Lozano would be out of there. Finally, defendant thought that the quickest way to be released would be to tell them what he thought they wanted to hear. He explained that confessing would get him released because he did not commit the murders; however, he did not tell the detectives about the man in black because it would not have been beneficial to them, as he could not describe his face or height. Defendant said he confessed to crimes he did not commit and denied killing Pirooz, Shahriar, or Khalili. Defendant also denied that Kim gave him cash to leave town, explaining that Kim gave him cash simply because defendant had none with him, and because he had left his $15,000 at the apartment with Khalili, the man in glasses.

Defendant testified that after leaving interview room he called Kim, and attempted to call his cousin Jason, but there was no response. Defendant then asked the detectives to return to the interview room, where he apologized for not having been truthful before, and told them that he was not the one who did the shooting. Defendant told the detectives that he was really going to be honest with them, and that the shooter was Peter Kim, his "fronter" and financier, whose idea it was to "jack these guys" and take the product. Defendant said they had agreed that defendant would go in first, but then Peter Kim suddenly showed up and began shooting. Defendant only grabbed the product and ran out with Peter Kim. He did not know that Peter Kim was going to shoot anyone.

On cross-examination defendant admitted that Peter Kim did not exist. Defendant testified that although he stipulated that he used the cell phone with the 842 number, he

12

had purchased several prepaid phones at a swap meet, and had given one to Lozano which was registered to a Peter Kim.

## I.  Motion to Suppress

Pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), defendant moved to suppress his confession on the grounds it was given after he invoked his right to counsel, and that the subsequent waiver of his rights to counsel and to remain silent was induced by deceptive and manipulative tactics.  Four witnesses testified:  first, Detective Chae Song, then defendant, and finally, Detectives Bergner and Marsh, who were excluded from the courtroom while not testifying.

Defendant contends that the trial court erred in denying his motion.

### A.  **Miranda** *Review*

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . [Thus] unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, . . . [p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive . . . these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda*, *supra*, 384 U.S. at pp. 444-445.)

At trial, the prosecution must prove by a preponderance of the evidence that a challenged confession was voluntary.  (*Lego v. Twomey* (1972) 404 U.S. 477, 488; *People v. Williams* (1997) 16 Cal.4th 635, 659.)  On appeal, we independently review the trial court's legal determination of voluntariness; however, we review for substantial evidence any factual findings regarding the surrounding circumstances of the confession. (*People v. Williams*, *supra*, at p. 660.)  "'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.]"  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

13

### B. Preadvisement tactics

Relying primarily upon *People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), defendant argues that improper "softening up" by Detective Song induced the waiver of his rights to counsel and to remain silent.

In *Honeycutt*, after that defendant was arrested and before he was given *Miranda* warnings, he was taken to an interview room where he was obviously hostile to one of the two detectives, calling him racist epithets and spitting at him. That detective then left the room. (*Honeycutt*, *supra*, 20 Cal.3d at p.158.) The detective who remained then engaged the defendant in a half-hour unrecorded discussion about "unrelated past events and former acquaintances and, finally, the [murder] victim," who the detective claimed was a homicide suspect thought to have homosexual tendencies. The detective admitted he was trying to get the defendant to talk about the murder. (*Ibid*.) The California Supreme Court found the detective's tactic of disparaging the victim while engaging in ingratiating conversation to be a "clever softening-up" of the defendant which invalidated his later waiver of rights. (*Id*. at pp. 160-161.) The court noted that both of the two improper interrogation ploys expressly condemned in *Miranda* were utilized in *Honeycutt*: "The first was the Mutt and Jeff routine where one officer acts aggressively and hostile while a second officer, when alone with the suspect, seeks to gain his confidence by disapproving his partner's behavior. [Citation.] The second was disparagement of the victim to induce in the defendant a feeling that his acts were justified. [Citation.]" (*Honeycutt, supra*, at p. 160, fn. 5, citing *Miranda, supra*, 384 U.S. at pp. 450, 452.)

Here, although Detective Song's conversation with defendant may have been ingratiating, there was no Mutt and Jeff routine and no denigration of the victim. Indeed, he did not speak of the victim or the murders. It is not improper for officers to engage in preadvisement rapport-building conversations which are unrelated to the crime and which could not reasonably be construed as calling for an incriminating response. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086-1087.) "Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a

threat or a promise, does not . . . make a subsequent confession involuntary. [Citation.]" (*People v. Boyde* (1988) 46 Cal.3d 212, 238, overruled on another point in *People v. Johnson* (2016) 62 Cal.4th 600, 648.)

Detective Song testified at the *Miranda* hearing that he had already interviewed Kim when he went to the station to meet defendant shortly after his arrest. Kim had told the detective that he and defendant were close friends, *hyung* and *dong sang*, that defendant's mother had passed away a few years earlier, and that defendant took her death very hard. Detective Song found defendant in a holding cell and introduced himself. Defendant asked whether the detective was Korean, Detective Song replied that he was, and after a short conversation, defendant said, "I could use a smoke." Smoking inside was not permitted, so Detective Song obtained permission from the investigating detectives to take him outside to a secured location in the parking lot. Defendant was not handcuffed, did not ask for an attorney, and asked no questions. Detective Song gave him one of his own cigarettes, and asked him whether he was doing okay. Defendant said that he was.

Detective Song acknowledged that he tried to build a rapport with defendant. He told defendant that Kim had said good things about defendant -- that he was a good kid, smart, hardworking, and loyal, and that they were close, like *dong sang* and *hyung*. He also told defendant that Kim had been worried about him. They spoke about defendant's mother, and Detective Song told defendant that he understood that it was very difficult, and that his mother had also passed away. He told defendant that his mother would know he was a good man based on what Kim had said.

Detective Song told defendant that the detectives were going to want to talk to him later, but he did not say about what, nor did he mention the events in Hollywood or why defendant was arrested. Defendant did not ask about anyone named Vanessa, and Detective Song denied knowing Vanessa. As they walked back inside after finishing their cigarettes, Detective Song told defendant to be truthful, to answer the detectives' questions, and to cooperate with them. Defendant did not ask for a lawyer, and once inside, Detective Song turned him over to the jailer. Detective Song then told Detectives

15

Bergner and Marsh he was leaving and that they had not talked at all about the case. Detective Song did not participate in the detectives' interview with defendant.

Relying on his own testimony at the hearing, defendant characterizes the conversation with Detective Song differently. Despite acknowledging the standard of review which requires that we accept the trial court's factual findings, resolution of conflicts, and credibility evaluations, defendant has summarized his own testimony at the hearing in detail. Defendant claims that his testimony demonstrated that he waived his rights because Detective Song told him he did not need an attorney and was led to believe that Detective Song would arrange to have him and Lozano released.[4]

Nevertheless, the trial court believed Detective Song and not defendant. The court found that although the smoking and conversation were unusual, Detective Song did not promise some benefit, make a threat, or say anything that would overcome defendant's will. The court concluded there was no improper interrogation technique, or softening up. Further, the court found it implausible that defendant asked Detective Song for an attorney. The court explained: "I don't accept this story that he's asking for a lawyer. It's something implausible in that context. So then he's brought back to the cell. And encouraging him or urging him to tell the truth isn't improper. So I can't see this in any sense as overbearing the defendant's free will."

Defendant does not contend that the trial court's factual findings and credibility resolution are unsupported by substantial evidence, and any such contention would be without merit. Substantial evidence and the many conflicts at the hearing support the trial court's findings that defendant testified falsely. Some of the conflicts were significant, such as defendant's claim that he asked for an attorney, that Detective Song

---

[4]    Defendant testified that Detective Song asked, "Harold, you know what happened back there in Hollywood, don't you?" Defendant claimed that Detective Song then told him that he could help by answering as many questions as honestly as he could, adding that "the sooner you get this done the sooner you guys will be out of here." Defendant claimed to have asked to contact his lawyer, that the detective patted him on the back and said he would not need one, and that he replied sternly and louder, "I would like a lawyer, sir." Defendant also claimed that Detective Song promised to see what he could do about Lozano.

16

mentioned the crimes and assured him that he did not need an attorney, and that they discussed Lozano. Others were small contradictions, such as defendant's claim that Detectives Bergner and Marsh passed by as defendant and Detective Song were smoking, while both detectives testified that they were already inside the station and did not go outside during that time, and that Detective Song gave him a second cigarette, while Detective Song testified that they each smoked only one. Corroborating Detective Song's version of the conversation, Sergeant Marsh testified that after Lozano was interviewed, Detective Song told them about his conversation with defendant. Defendant asked Detective Song, "Are you Korean?" and asked to have a smoke. Detective Bergner testified that he and Sergeant Marsh both gave permission to take defendant outside, and that Sergeant Marsh told Detective Song, "Don't discuss the case. Just have a cigarette and then put him back in the cell." Afterward, Detective Song assured Sergeant Marsh they had spoken about nothing of relevance to the investigation.

Further, defendant contradicted his own testimony. He testified that during his interview with Detectives Bergner and Marsh, the detectives did not say he could have an attorney and they did not go through all of the *Miranda* rights with him, but he then testified that the *Miranda* rights were written on a piece of paper, and the detectives did not gloss over them. As defendant was knowingly false in one part of his testimony, the trial court was entitled to distrust the whole of his testimony. (See *People v. Cook* (1978) 22 Cal.3d 67, 86.) Defendant also admitted that he lied in his interview, and that he called the detectives back after the they concluded the interview in order to change his story.[5]

In sum, substantial evidence supports the trial court's findings that defendant was not believable, that Detective Song was believable, that defendant did not ask for counsel, and that Detective Song's conversation did not prompt or discourage such a request. We thus accept the trial court's findings. While Detective Song was ingratiating, he was not preceded by a hostile officer, and the conversation, which was unrelated to the crime and

---

[5] At trial, defendant admitted that he changed his story several times.

17

not accompanied by any threat or promise, could not reasonably be construed as calling for an incriminating response. We conclude that Detective Song's conversation did not amount to improper "softening up."

## C. Mid-interview **Miranda** *advisement*

Defendant also contends that the *Miranda* advisement was ineffective, because it was given after he made extensive incriminating admissions to the interrogating detectives, and that the trial court was thus required to exclude, at a minimum, that portion of the interview conducted prior to the *Miranda* advisement.

Respondent counters that defendant failed to object on this ground, and that defense counsel expressly waived this issue.

Evidence Code section 353 subdivision (a) provides that a "judgment will not be reversed on grounds that evidence has been erroneously admitted unless 'there appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so *stated as to make clear the specific ground of the objection or motion . . . .*' [Citation.] Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence. [Citations.] *Miranda*-based claims are governed by this rule. 'The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal.' [Citations.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 853-854.)

We agree that defendant did not object to the detectives' interview on the ground that the *Miranda* advisement was ineffective because it was given after he made incriminating admissions, and we agree that defense counsel waived the issue. At the pretrial hearing, defense counsel expressly told the court that the motion to exclude the interview was based solely on defendant's invocation of his right to counsel in his conversation with Detective Song, and not on the conversation with the two detectives. When the prosecutor sought clarification, defense counsel stated that defendant's conversation with Detectives Marsh and Bergner was *not* a basis for the claim. Moreover, the recorded interview was not in evidence at the hearing. Thus, the trial court

18

had no means to evaluate whether the preadvisement admissions were in fact incriminating.

In reply, defendant agrees with respondent's summary of the discussion in the trial court, and quotes it at length. Defendant argues, however, that it was not an express waiver, because he objected generally to the admission of the entire recorded interview. He also contends that there is no forfeiture, as he is *not in fact* seeking reversal on the ground that Detectives Bergner and Marsh gave the *Miranda* advisement mid-interrogation, after defendant had made incriminating statements to them.[6] Instead, defendant's challenge is to the interview based upon the conversation with Detective Song and his invocation of the right to counsel with Detective Song, rather than the effectiveness of the mid-interrogation waiver of rights given to Detectives Marsh and Bergner. If this is in fact defendant's contention, given our previous finding that defendant did not request an attorney, we must also reject this contention and end the discussion. However, defendant's remaining arguments suggest that his alleged invocation of the right to counsel is not in fact the basis for this argument.

Defendant contends that his objection to the entire interview, based on the conversation with Detective Song, amounted to a "blanket objection" which preserved all *Miranda* issues because the trial court's evidentiary hearing included his blanket objection. We disagree. An objection must be sufficiently specific to permit "the trial court to determine the question intelligently, and for the appellate court to have a record adequate to review for error." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1172.) As defendant did not make a specific objection based upon the content of the recorded

---

**6** Defendant's assertion is puzzling in light of his extensive summary of pre-*Miranda* statements alleged to be incriminating, as well as the following argument in his opening brief: "Appellant's statement to the detectives prior to receiving a *Miranda* warning should have been excluded from the prosecutor's case in chief. The detectives' extensive questions about the case far exceeded the booking exception to *Miranda*. [Citations.] Appellant's statements also did not fit within the exception for unprompted statements, as appellant answered direct questions by the interrogating officers. They were not spontaneous statements made by appellant without prompting by law enforcement. [Citation.]"

19

interview, the trial court heard only the *Miranda* issue that was raised. In the alternative, defendant requests that we exercise our discretion to reach the issue. While such discretion may be exercised in other circumstances, the appellate court is not authorized to do so when the issue involves the admission or exclusion of evidence. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

Defendant also asks that the issue of the mid-interrogation advisement be reached because trial counsel's failure to object or his express waiver of the issue deprived defendant of the effective assistance of counsel. "It is rarely appropriate to resolve an ineffective assistance claim on direct appeal [citation.]; [and] certainly . . . not . . . where, as here, the claim is omitted from the opening brief and thus waived [citations]." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

Moreover, we agree with respondent that such an objection would have been properly denied, as it is meritless. For the first 35 minutes of the interview the detectives and defendant conversed mostly about defendant's recent living arrangements, acquaintances, and his work procuring marijuana for dispensaries. Such preadvisement rapport-building conversations are not improper so long as the officers' questions cannot reasonably be construed as calling for an incriminating response. (*People v. McCurdy*, *supra*, 59 Cal.4th at pp. 1086-1087.) There must be an "interrogation" to trigger *Miranda* safeguards. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300.) "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Id.* at p. 301, fn. omitted; *People v. Dement* (2011) 53 Cal.4th 1, 26.) "'Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' [Citation.]" (*Dement, supra*, at p. 26, quoting *People v. Clark* (1993) 5 Cal.4th 950, 985, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

20

Here, there was no interrogation prior to the *Miranda* advisement. When asked about his cell phone numbers, defendant volunteered that he had thrown away the cell phone with the 842 number. When Detective Marsh asked whether it was because the phone ran out of minutes, defendant agreed, but volunteered that he "just got freaked out . . . because of all that crazy stuff going on . . . this past weekend . . . in Hollywood," because he knew one of the three men, whom he called "P" and who was one of his vendors. Defendant then, without prompting, said he was supposed to meet P to pick up product the night he died, waited for him outside the Hollywood apartment as usual, but since he badly needed to use a restroom he drove away to find one. When he returned 10 or 15 minutes later, he saw police cars outside the building, and "all this craziness." At that point, defendant had not incriminated himself and the detectives had not asked any questions reasonably likely to elicit incriminating answers. Detective Marsh then stopped the interview to give defendant *Miranda* advisements.

Defendant told the detectives that he had been arrested before, had been advised of his *Miranda* warnings on those prior occasions and was fully aware of his constitutional rights.[7] Defendant recited his right to remain silent and to have "one" appointed for him. The detectives gave defendant an 8.5 x 11 inch form with the *Miranda* admonition and waiver of rights printed on it. Detective Marsh told defendant that he did not want to gloss over the warnings with him, and asked, "[A]nd with all those rights in mind, are you willing to talk with us about this case?" Defendant replied, "Yes, sir." Defendant never asked for an attorney.

Under such circumstances, any objection based upon the detectives' failure to give defendant *Miranda* advisements during the first 35 minutes of his interview would most certainly have been overruled. The Sixth Amendment does not require a defense counsel to raise unmeritorious motions or make futile objections. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804-805.) It was defendant's burden to overcome the presumption that

---

[7] We find no evidence that Detective Marsh acted as though the prior advisements obviated the need for a *Miranda* warning in this case, as defendant argues.

21

counsel's assistance was inadequate. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1211.) He has failed to do so.

Moreover, it was defendant's burden to demonstrate prejudice from the admission of the evidence. (*Strickland v. Washington* (1984) 466 U.S. 668, 694-695; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) Defendant has failed to meet that burden, as well. Prejudice due to an asserted inadequacy of counsel is not demonstrated by arguing, as defendant has done, that prejudice is presumed, or that respondent must demonstrate harmlessness beyond a reasonable doubt. Rather, defendant must affirmatively prove prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra*, at p. 694.)

Defendant argues that without the confession, the evidence was insufficient to prove that he was the shooter, because the murder weapon was not found, there were no eyewitnesses to the shooting, and neither his fingerprints nor blood was found at the scene. Nevertheless, compelling circumstantial evidence pointed to defendant as the shooter. Long before the confession, detectives had found Pirooz's cell phone with many calls to and from defendant's 842 number. Records for defendant's phone led them to Kim, and thus to the identity of defendant as the user of the 842 number. Numerous text messages to Pirooz indicated that defendant had been recently purchasing large quantities of marijuana from him, and that defendant and Pirooz had arranged to meet at Pirooz's home on the night of the murders for defendant to make such a purchase. A neighbor saw an uncomfortable looking Asian man wearing a black baseball cap, a black shirt, and a black backpack take the elevator to Pirooz's floor just 10 minutes before that neighbor and another resident heard gunshots. When defendant was arrested, he was in possession of a black backpack, black baseball cap, and a black shirt. All the bullets found at the scene and in the victims were fired from one firearm, suggesting a single assailant. Immediately after the killings, at approximately 9:00 p.m., defendant telephoned his mentor Kim, and told him he had "fucked up." There was no evidence of a fifth person

22

in the apartment or of a survivor of the shooting other than defendant. Although defendant had no money and no job when he was arrested, he was in possession of large amounts of marijuana, with a wholesale value of $20,000 to $30,000, and a street value of $40,000 to $70,000. Defendant thus had a motive to rob Pirooz.

The most reasonable inference from such facts is that he robbed Pirooz at gunpoint, and then shot the three potential witnesses against him. Also telling of defendant's guilt was the removal of all his belongings from Kim's home on the night of the murder, including his mother's photograph. At the time of his arrest defendant had all his clothing in his car, as well as his birth certificate and passport photos, suggesting he was preparing to flee the country, and suggesting a consciousness of guilt. (See *People v. Rogers* (2013) 57 Cal.4th 296, 333.)

We conclude that if defendant's confession had been excluded, there is no reasonable probability that a different outcome would have resulted. In sum, not only did defendant's trial counsel waive or forfeit the issue of the mid-interview *Miranda* advisement, defendant has failed to demonstrate that counsel erred, that an objection would have been well taken, or that he suffered any prejudice from the admission of the confession.

## II. Third-party culpability evidence

Defendant contends that the trial court abused its discretion in excluding defendant's proffered evidence of third-party culpability, and that the error violated his constitutional rights to present a defense and to a fair trial.

"[A]ny relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged [is admissible]. Such evidence may be excluded only when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury." (*People v. Hall* (1986) 41 Cal.3d 826, 829, fn. omitted.) "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable

23

doubt of defendant's guilt. At the same time, [it is not required] that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Id*. at p. 833.)

"The trial court has broad latitude in determining the relevance of evidence. [Citations.] We review such determinations for abuse of discretion. [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490.) The trial court's discretion under Evidence Code section 352 will not be disturbed unless it was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

When the trial court asked for defendant's offer of proof as to the proposed testimony from Ahoubim, defense counsel stated it would show: that Ahoubim knew and had dated both Pirooz and Khalili; that at the time of the murders she had just broken up with Khalili; that Khalilil sent her the text (already in evidence) that he was making lots of money; that she was interviewed by Detectives Marsh and Bergner right after the murders and told them she had information about people potentially involved in the crimes; and that Pirooz had planned a robbery of a dispensary owned by a Russian woman. In addition, counsel offered to show that Pirooz had sent text messages to Khalili, asking whether he still had a gun for sale. Khalili replied that he could find one, and asked why. To which Pirooz texted back: "For the Alla . . . OPP"; and "LOL. No. My friend called, wanted to know if we had one, a clean one. . . . One that doesn't come back to you or me."[8] Defense counsel argued that the texts would lend credibility to the possibility that there was going to be a robbery or that there had been a robbery. Ahoubim would also testify that she believed Kramer, who was the Russian woman's friend and owner of the grow house, might have had something to do with the killings.

---

[8] The date and time of the texts were not given by defense counsel, who referred to exhibit B, which is not in the record on appeal.

When defendant made his offer of proof, Sergeant Marsh had already testified that Cernov was a coowner of a collective marijuana dispensary in Hollywood, and that he had spoken to Ahoubim. Ahoubim told him she was an acquaintance of Khalili, that Khalili and Kramer grew marijuana at Kramer's grow house, and that their drug transactions were in the $20,000 range. On the night of the murders, Khalili sent her the following text at about 8:34 p.m.: "Daddy is making $$$." Defendant had testified that he fled as soon as an unknown man dressed in black suddenly appeared in the apartment making a gesture that looked like he was brandishing a weapon.

The trial court found the proposed testimony to be speculative, as it described no "direct or substantial evidence linking a third person to the actual perpetration of the crime." The court acknowledged that due process required the court to consider any *relevant* evidence, but found that the proffered evidence did "not have a tendency to raise a reasonable doubt under these circumstances."

Defendant contends that Ahoubim's testimony would have linked Kramer to the shootings, because he, Ahoubim, Pirooz, Khalili, and Cernov, were all acquainted, and all belonged to a "small community of people involved in high states marijuana sales." He argues that Ahoubim's testimony that she believed Pirooz was involved in planning a robbery of a marijuana dispensary and that she believed that robbery implicated Kramer in the murders, plus the text about purchasing a "clean" gun "For the Alla . . . OPP," would suggest that Kramer wished to retaliate against Pirooz for the robbery of the dispensary, and that it presented evidence "worth pursuing at trial."

Defendant cites no authority suggesting that "worth pursuing at trial" is an alternate definition of relevant. Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Ahoubim's opinion had no such tendency. As it was irrelevant and inadmissible on the issue of the guilt or innocence of defendant (*People v. Vang* (2011) 52 Cal.4th 1038, 1048), it follows that her opinion would not be relevant on the issue of the guilt of some third party instead of defendant. Thus, there

25

could be no abuse of discretion in excluding Ahoubim's belief that Pirooz was involved in planning a robbery which implicated Kramer in the murders.

Further, we agree that the proffered evidence was speculative. Whatever Pirooz might have meant by his text, "For the Alla . . . OPP," it was followed by "LOL," and could easily have been a joke. It certainly cannot be construed as having anything to do with Kramer in the absence of Ahoubim's inadmissible opinion that there was some connection. Regardless, even if Kramer were somehow linked to the shootings, it would remain speculative whether he was defendant's mystery man in black.

We conclude that the proffered evidence was incapable of raising a reasonable doubt of defendant's guilt, and that it was too speculative to show a third party's possible culpability. The trial court did not abuse its discretion by sustaining the prosecution's objection to the evidence. Nor did the trial court's ruling implicate defendant's constitutional rights to a defense and fair trial. "[T]he exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights. [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261, citing *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.)

Regardless, the exclusion of Ahoubim's testimony was harmless beyond a reasonable doubt in light of defendant's properly admitted confession to the murders.

## III.  *Pitchess* **review**

Prior to trial, defendant brought a *Pitchess* motion for the discovery of all material in the personnel files of Detectives Bergner, Marsh, and Song relating to dishonesty, false reporting, or misconduct amounting to moral turpitude. The trial court granted the motion, conducted an in camera review, and determined that there were no discoverable items in the records produced. Defendant requests a review of the transcript of the in camera hearing and the trial court's determination that there were no discoverable items in the records produced pursuant to defendant's *Pitchess* motion. We review the trial court's determination for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.)

26

The records produced in the trial court were not retained, but during the in camera hearing the court examined and described each document and stated the reasons for its determination.  We are in possession of the sealed transcript of that hearing, and find it sufficient to review the trial court's determination, without having to order the production of the same documents in this court.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.)  Upon review of the sealed record of the in camera proceedings we conclude the trial court properly exercised its discretion in determining that the documents produced complied with the scope of the *Pitchess* motion, and that none of the documents or information should be disclosed to the defense.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
HOFFSTADT

27